**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| DEREK SIMPSON,<br>Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br>Defendant. | ) | C.A. No. 26-cv-737-MRD-AEM |
| JOSEPH PINION,<br>Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br>Defendant. | ) | C.A. No. 26-cv-738-MRD-AEM |

**MEMORANDUM AND ORDER**

Melissa R. DuBose, United States District Judge.

Most would agree that, for the student athlete, there is no bigger stage, fiercely competitive arena, or opportunity for glory than NCAA Division I college sports. This is undoubtedly true when it comes to NCAA Division I Men's Basketball.[1] One needs

[1] The Court gives a nod to the increasing popularity of NCAA Division I Women's Basketball. Last year's championship game between the University of South Carolina Gamecocks and the University of California, Los Angeles Bruins was the third most-watched Women's NCAA championship game ever on ESPN and peaked at over 10 million viewers. Katie Callahan, *ESPN Scores Second Most-Watched NCAA Women's Final Four on Record*, ESPN Press Room (April 7, 2026), https://espnpressroom.com/press-release/espn-scores-second-most-watched-ncaa-womens-final-four-on-record/ [https://perma.cc/HNG7-CVQB].

only to tune into the *One Shining Moment* montage that caps March Madness to witness the enduring magic of the NCAA tournament: individual players shooting their shot at a Cinderella moment and year after year some player delivers.[2] For student-athletes competing in the 2026-2027 season, the stakes are far greater than a spot in the annals of school lore, a championship, or a pathway to the pros. Access to significant monetary compensation is at play. *See In re Coll. Athlete NIL Litig.*, 803 F. Supp. 3d 959 (N.D. Cal. 2025), *appeal dismissed*, No. 25-4185, 2025 WL 2831020 (9th Cir. July 29, 2025), and *objections overruled*, No. 20-CV-03919 CW, 2025 WL 3501920 (N.D. Cal. Nov. 13, 2025).

There is equally no doubt that not every student athlete who wants to compete in NCAA Division I athletics can. There are roles and rules of the game that are beautifully executed when all stakeholders (including players, coaches, athletic directors, officials, and others) maintain their respective lanes and adhere to the rules. Without strict adherence to those lanes and regulations, chaos ensues. This unfortunately is the current state of play.

When determining eligibility – specifically, *who* may compete in NCAA Division I athletics and *for how long* – the NCAA occupies a distinct and critical role. The authority to establish and administer those eligibility rules rests with the NCAA, and the integrity of the system depends on respect for that authority.

---

[2] *See, for example, One Shining Moment, 2026 March Madness*, YouTube (April 7, 2026), https://www.youtube.com/watch?v=nhTmvfxmFyU [https://perma.cc/DYD2-UHQP].

Derek Simpson and Joseph Pinion are two highly accomplished and talented student-athletes who are currently enrolled at Providence College, seeking to compete on the men's basketball team for this upcoming season. Both are members of the high school class of 2022 and competed in Division I men's basketball for the past four seasons. Two months after their fourth (and at that time, what was thought to be their final) season ended and they graduated from college (Simpson from Saint Joseph's University and Pinion from the University of South Florida), the NCAA announced a new eligibility rule allowing student-athletes to compete in five seasons of competition over five years. The NCAA applied the rule prospectively and to players with remaining eligibility, thereby excluding players from the high school class of 2022 who played four consecutive seasons. Athletes across the country who had exhausted their four years of eligibility under the old NCAA rule (four seasons across five years), including Simpson and Pinion, are seeking to take advantage of the new rule. But when they tried to take advantage of this rule, the NCAA called foul and barred them from participating in the upcoming 2026–2027 season.

Simpson and Pinion are now seeking relief in this Court, filing a complaint claiming antitrust violations and breach of contract and immediately moving for a temporary restraining order. They are asking the Court to review and reverse the NCAA decision. For the reasons discussed below, the NCAA's call stands and the players' request for immediate, temporary relief is denied.

## I. BACKGROUND[3]

Plaintiffs Derek Simpson and Joseph Pinion graduated from high school in 2022 and started their collegiate student-athlete careers that same fall. Dkt. 737, ECF No. 10 ¶¶ 18, 54; Dkt. 738, ECF No. 10 ¶¶ 18, 54. Simpson played his first two seasons (2022–2023 and 2023–2024) of college basketball at Rutgers University and his next two seasons (2024–2025 and 2025–2026) at Saint Joseph's University. Dkt. 737, ECF No. 10 ¶¶ 54–56. Pinion played his first two seasons (2022–2023 and 2023–2024) at the University of Arkansas, his third season (2024–2025) at Arkansas State University, and his fourth season (2025–2026) at the University of South Florida (for coach Bryan Hodgson, the current coach of the Providence College Friars). Dkt. 738, ECF No. 10 ¶¶ 54–56. Simpson and Pinion are now enrolled at Providence College and seek to compete for the Friars in the upcoming 2026–2027 men's basketball season. Dkt. 737, ECF No. 10 ¶¶ 1, 53; Dkt. 738, ECF No. 10 ¶¶ 1, 53. Both have been deemed ineligible by the NCAA because they have exhausted the four seasons of eligibility to which they were entitled before the NCAA changed the eligibility rules applicable to Division I sports. *Id.*; Dkt. 737, ECF No. 11 at 14; Dkt. 738, ECF No. 11 at 13.

At the center of this controversy is the NCAA's new eligibility rule which provides student-athletes with an opportunity to compete in five athletic seasons

[3] The players present identical claims and arguments for this Court's consideration. Throughout this Order, the Court will cite to the *Simpson v. NCAA*, 26-cv-737 ("Dkt. 737") docket when the argument is the same for Simpson and Pinion, and will cite to each player's specific case only when necessary.

within five years. Dkt. 737, ECF No. 10 ¶¶ 32–33; Dkt. 738, ECF No. 10 ¶¶ 32–33. Colloquially dubbed the "5-in-5" Rule, the NCAA Division I Cabinet unanimously passed this new eligibility framework, announced it on June 24, 2026, and it took effect on August 1, 2026. Dkt. 737, ECF No. 11 at 14 –15; ECF No. 11-4 at 8. Under the NCAA Division I 2026–27 Manual, the 5-in-5 Rule specifically provides the following:

> **12.6 Five-Year Period of Eligibility.** An individual's period of eligibility for practice and competition shall be limited to five years. An individual's five-year period of eligibility begins with the earlier of the following:
>
> (a) The regular academic term (semester or quarter) of an academic year in which the individual enrolls in a collegiate institution … in a minimum full-time program of studies and attends a class in that term while enrolled full time; or
>
> (b) The beginning of the regular academic year immediately after the individual's 19th birthday.

Dkt. 737, ECF No. 3-3 at 55–56. In announcing the Rule and the student-athletes to which it applied, the Division I Cabinet explained:

> Effective Date. August 1, 2026; may be applied to student-athletes with eligibility remaining (seasons and period of eligibility) who initially enrolled full time in any collegiate institution before August 1, 2026. May be applied to student-athletes who initially enroll full time in any collegiate institution in the 2026-27 academic year (Current rules may be applied to student-athletes who enrolled before or enroll during the 2026-27 academic year; however, no waivers will be available.) Applicable to student-athletes who initially enroll full time in any collegiate institution in 2027-28 and thereafter.

Dkt. 737, ECF No. 11 at 14–15.

This 5-in-5 Rule replaced the previous "4-in-5" rule, which provided student-athletes four seasons of eligibility within five years. Dkt. 737, ECF No. 11-4 ¶ 11.

Jennifer Henderson, Managing Director of Division I Governance and Members Services at the NCAA, explains that the previous rule "allowed for an individualized waiver process" and for athletes to engage in "redshirting" if they met criteria outlined in the bylaws.[4] *Id.* ¶¶ 12–13. This was the eligibility rule "[u]p to and including the 2025–26 academic year[.]" *Id.* ¶ 11. Ms. Henderson explains that these two rules, as applied to the high school class of 2022, may produce the following result:

> 14. Student-athletes that graduated high school in 2022 and were redshirted for a year would have engaged in three seasons of intercollegiate competition through the 2025–26 season. Under Division I Bylaw 12.6, these student-athletes therefore retained eligibility to compete during the 2026–27 athletic season.
>
> 15. Student-athletes that graduated high school in 2022 and were never redshirted would have engaged in four seasons of intercollegiate competition through the 2025–26 season. Under Division I Bylaw 12.6, these student-athletes exhausted their eligibility after the 2025–26 season and therefore were not eligible to compete during the 2026–27 athletic season.

*Id.* ¶¶ 14–15.

According to the NCAA, Plaintiffs Simpson and Pinion fall into the second category of student-athletes and thus exhausted their eligibility after the 2025–26 season. Dkt. 737, ECF No. 11 at 14; Dkt. 738, ECF No. 11 at 13. With the preseason officially underway and the regular season set to begin shortly, Plaintiffs come to this

---

[4] As Ms. Henderson explains, "[r]edshirting refers to the practice by which a student-athlete remains enrolled at an institution and may practice and train with their team but does not compete in intercollegiate athletics during a particular season, thereby preserving a season of competition for use in a later year." ECF No. 11-4 ¶ 13.

Court seeking a "temporary restraining order enjoining the NCAA from enforcing its 2022 carveout or otherwise preventing Plaintiff[s] from participating in the upcoming 2026–27 men's basketball season at Providence College." Dkt. 737, ECF No. 3-1 at 17; Dkt. 738, ECF No. 3-1 at 17. Both Plaintiffs advance the same claims for relief: (1) Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, (2) Breach of Contract – Intended Third-Party Beneficiary, and (3) Declaratory Judgment. Dkt. 737, ECF No. 10 at 15–18; Dkt. 738, ECF No. 10 at 15–18.

## II. LEGAL STANDARD

To obtain a temporary restraining order, Plaintiffs must show that the following four factors weigh in their favor: (1) likelihood of success on the merits; (2) potential for irreparable injury; (3) balance of the relevant equities; and (4) the requested relief is in the public interest. *New York v. Trump*, 764 F. Supp. 3d 46, 49 (D.R.I. 2025) (citing *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981)). This type of relief, although temporary, "is an extraordinary and drastic remedy that is never awarded as of right[.]" *Id.* If a plaintiff fails to establish a likelihood of success on the merits, then the inquiry ends and "the remaining factors become matters of idle curiosity." *Paradise v. Brown Univ.*, 21-CV-057-MSM-PAS, 2021 WL 6973858, at *1 (D.R.I. Feb. 5, 2021) (quoting *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 46 (1st. Cir. 2005)).

Typically, a temporary restraining order is issued to "preserve the status quo, [and to] freez[e] an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM*

*Cable Rep., Inc. v. Ocean Cost Prop., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). In some situations, plaintiffs may seek temporary relief that alters the status quo. "[A]n injunction that alters the status quo … is atypical. Designated as a 'mandatory injunction,' such relief 'normally should be granted only in those circumstances where the exigencies of the situation demand such relief.'" *Harris v. Wall*, 217 F. Supp. 541, 553 (D.R.I. 2016) (quoting *Braintree Lab'y, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010)). "Put differently, because a mandatory preliminary injunction alters rather than preserves the status quo, such an injunction should not issue unless the facts and the law clearly favor the moving party." *Id.* (citing *Robinson v. Wall*, No. C.A. 09-277-S, 2013 WL 4039027, at *2 (D.R.I. Aug. 7, 2013)).

## III. DISCUSSION

In their quest for a temporary restraining order, Plaintiffs must satisfy this Court that they are likely to succeed on either their Sherman Act claim or the breach of contract claim (or both). Before addressing the merits of those arguments, the NCAA raises a preliminary issue regarding whether these Plaintiffs are entitled to pursue these claims in this Court at all. The NCAA asserts that Simpson and Pinion are mandatory members of the class certified in *Wisne v. NCAA*, 1:26-cv-3063-CNS-KAS, ECF No. 37 (D. Colo. July 31, 2026), and thus the first-to-file doctrine counsels against this Court allowing this litigation to proceed. Because that determination is a threshold issue, the Court will first address that litigation and how it may impact these Plaintiffs, and then it will move into the likelihood of success of each claim.

### A. *Wisne* Certified Class

The NCAA accuses Plaintiffs of forum-shopping because, in its view, Simpson and Pinion are members of a federal class action case in the District of Colorado. *Wisne*, 1:26-cv-3063. In that case, a group of student-athletes deemed ineligible for the upcoming season for the same reasons as Simpson and Pinion, filed a Class Action Complaint and Motion for Temporary Restraining Order challenging the NCAA's decision to exclude 2022 high school graduates from competing under the new 5-in-5 rule. *Wisne*, 2026 WL 2214234, at *1–3. On July 31, 2026, the District Court in Colorado granted the Plaintiffs' request for a restraining order and certified the following class:

> All persons in the United States who began to play in collegiate sports in the 2022–2023 season, competed in NCAA Division I sports, and completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025–2026 season, and are therefore barred from playing a fifth season due to the NCAA's adoption and immediate implementation of the Five-Year Eligibility Rule.

*Id.* at *22; *Wisne*, 1:26-cv-3063, ECF No. 37 at 17. The NCAA requested a stay of the temporary restraining order and appealed to the United States Court of Appeals for the Tenth Circuit. On August 21, 2026, the Tenth Circuit granted the NCAA's request and stayed the district court's restraining order. *Wisne v. NCAA*, No. 26-1309, ECF No. 28 (10th Cir. Aug. 21, 2026).

Appealing to the first-to-file rule, the NCAA argues that this Court should grant deference to the Tenth Circuit case and stay this case. Dkt. 737, ECF No. 11 at 19. Plaintiffs urge the Court to reject the NCAA's invitation because there is no final judgment and deference to that case is therefore discretionary. Dkt. 737, ECF

No. 12 at 4. On the first-to file rule, the First Circuit has explained that "[o]bvious concerns" arise when cases involving similar parties and subject matters are pending in different federal district courts, including "wasted resources because of piecemeal litigation, the possibility of conflicting judgments, and a general concern that the courts may unduly interfere with each other's affairs." *TPM Holdings v. Intra-Gold Indus.*, 91 F.3d 1, 4 (1st Cir. 1996). In situations where the overlap between two cases is "'nearly complete[,]' the usual practice is for the court where the case was first filed to resolve the issues, and the other court to defer by either staying, transferring, or dismissing the action." *Thakkar v. United States*, 389 F. Supp. 3d 160, 170 (D. Mass. 2019) (quoting *TPM Holdings*, 91 F.3d at 4).

The concern about inconsistent rulings is real. Take this as an example. If this Court denies Plaintiffs their requested relief and the Tenth Circuit subsequently vacates the stay and allows the district court injunction to stand, what happens? The Court is hard pressed to believe that the players, in that scenario, would not fervently argue that they are members of the *Wisne* class and eligible to suit up for the upcoming season despite this Court's order to the contrary.

In this Court's view, Simpson and Pinion are members of the *Wisne* class. Further, the cases involve similar parties (athletes seeking a fifth year of eligibility and the NCAA), the same legal issue (Section 1 of the Sherman Act), and same primary relief (injunctive relief so they can play in the 2026–27) season. At this point, however, the Court declines to exercise its discretion to delay ruling on the motion before it because of the current posture of the *Wisne* case. On October 13, 2026, the

parties argued the merits of the NCAA's appeal from the TRO. A decision will be forthcoming, and one would assume soon. *Wisne*, 26-1309, ECF No. 51. The Court may revisit this decision when the Tenth Circuit issues a decision, but, at this point, declines to stay this case while the case out West is on appeal with the district court's order stayed. Accordingly, the analysis proceeds to whether the Plaintiffs have a likelihood of success on their claims.

**B. Antitrust Claim**

Plaintiffs' first claim is that the NCAA's 5-in-5 rule violates Section 1 of the Sherman Act because it "restrict[s] athletes' labor and ability to compete in Division I markets and earn [name, image, and likeness] compensation." Dkt. 737, ECF No. 3-1 at 7. In making this argument, Plaintiffs rely exclusively on two sources: (1) the declaration of Ted Tatos, a quantitative microeconomist and statistician, ECF No. 5, and (2) a district judge's decision to grant a preliminary injunction in *Lorient v. NCAA*, No. 1:26-CV-94, 2026 WL 2958759 (N.D. W.V. Sept. 30, 2026). Dkt. 737, ECF No. 3-1 at 6–11. The NCAA contends that Plaintiffs fail to demonstrate a likelihood of success on their antitrust claim and primarily argues that the Tatos declaration fails to define a relevant market. Dkt. 737, ECF No. 11 at 20–26. It then suggests that even if the relevant market is adequately defined, it wins at every step of the required rule of reason analysis. *Id.* at 26–29.

Antitrust suits against the NCAA are not uncommon, but to prove "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 93 (2021). The NCAA

has accepted "that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can [] harm competition." *Id.*[5] But that is not enough. The Supreme Court has understood claims under 15 U.S.C. § 1 "to outlaw only *unreasonable* restraints." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018). To determine whether the NCAA application is an "unreasonable restraint," the parties agree that the rule of reason analysis applies. Dkt. 737, ECF No. 3-1 at 8–11; ECF No. 11 at 22–29. As explained in *Ohio v. American Express Co.*, and applied in *NCAA v. Alston*, the rule of reason is "a three-step, burden shifting framework" that helps "'distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'" *Am. Express*, 585 U.S. at 541 (quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 886 (2007)); *see Alston*, 594 U.S. at 96–97.

Before getting into the rule of reason, Plaintiffs "must first define the relevant market[]" because "'[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.'" *Am. Express*, 585 U.S. at 542 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)). "[T]he relevant market is defined as 'the area of effective competition.'" *Id.* at 543 (quoting *Walker Process Equip., Inc.,* 382 U.S. at 177). Once the market is defined the Court can move to the rule of reason burden shifting

[5] As Plaintiffs describe, "[a] monopsony occurs when one buyer dominates a market, giving the buyer significant power over the price it pays, such as wages in a labor market." Dkt. 737, ECF No. 3-1 at 6 n.2.

framework. "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* at 541. "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* Finally, "[i]f the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

Plaintiffs define the market as the "nationwide market for athletes in Division I sports." Dkt. 737, ECF No. 10 ¶ 61. Though that market is not clearly articulated in their Motion, Plaintiffs rely on Ted Tatos' declaration relying on this definition as well as the *Alston* case to support that the market is appropriately defined. *See* Dkt. 737, ECF No. 3-1 at 8–9. The NCAA disputes that Plaintiffs have carried their burden. First, it notes that Plaintiffs "simply lift[] the market from the *Alston* litigation … and asserts that the relevant market is therefore defined because [Mr. Tatos] agrees." Dkt. 737, ECF No. 11 at 23. Second, and more importantly, the NCAA vehemently disputes that Mr. Tatos' declaration provides enough information and data to support their asserted market definition. *Id.* at 24. The Court agrees with the NCAA on both points.

As the NCAA correctly notes, the Supreme Court never reviewed the district court's market definition in *Alston, see* 594 U.S. at 86 (stating clearly that "[t]he parties do not challenge the district court's definition of the relevant market"), which is markedly different from the Supreme Court expressly accepting that the market

was correctly defined as "athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market," *id.* at 81 (citing *In re: Nat'l Collegiate Athletic Ass'n Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1097 (N.D. Cal. 2019)). Further, as the NCAA points out, several circuit courts have rejected district court findings that relied on *Alston* to define the relevant labor market. Dkt. 737, ECF No. 11 at 23–24 (citing to cases in the Third, Fourth, and Seventh Circuits where this argument was rejected). Lastly, in *Alston*, the district court defined the market after "a 10-day bench trial[] [where] [i]t heard from experts and lay witnesses … and received volumes of evidence …." 594 U.S. at 80.

This leads to the NCAA's next argument: Mr. Tatos' declaration fails to satisfy the "fact-specific assessment." Dkt. 737, ECF No. 11 at 23–24. Plaintiffs agree that the relevant market must be defined "through a fact specific assessment of market power and market structure …." Dkt. 737, ECF No. 3-1 at 8; *see Robinson v. NCAA*, 172 F.4th 271, 292–24 (4th Cir. 2026) (finding that the plaintiffs failed to define the market at the district court level). Beyond arguing that Mr. Tatos lifts the definition from *Alston*, the NCAA also argues that he failed to apply "quantitative tools such as the 'SSNIPT' test," and fails provide specifics on measurable prices, such as "revenue-sharing payments, and NIL compensation." Dkt. 737, ECF No. 11 at 23–25. It also argues that descriptive statistics about "Olympic participants, NFL and NBA roster counts, and aggregate draft probabilities of reaching professional leagues in certain NCAA sports … is not the same as showing that student-athletes would decline to

substitute if Division I terms changed." *Id.* at 25. In other words, claiming that these opportunities may be scarce is not the same as saying student-athletes would not switch to other athletic opportunities if Division I terms changed. Further, another critique of this market that the Court cannot help but note, is that the substitution opportunities available for men's D1 basketball players at Providence College are starkly different from those substitution opportunities available to the Fairfield University women's rowing team.

The Court finds that Mr. Tatos' declaration, while laying out a helpful framework and relevant questions needed to define the market, lacks the data to support his conclusion that the market is "NCAA Division I intercollegiate athletics, wherein each athlete participates in his or her specific market (i.e., sub-market)." Dkt. 737, ECF No. 5 ¶ 16. While he describes "[t]he [College Sports Commission] and Evidence of Restrictions on NIL Compensation" and NCAA caps on revenue sharing, *id.* ¶¶ 27–36, he fails to provide specific data about NIL compensation or revenue sharing. His claim that the data "lies entirely in the NCAA's possession[,]" *id.* ¶ 74, does not move this Court or excuse the requirement. *Some* data could have been sought from NIL collectives, schools, conferences, coaches, or other websites (such as On3) that widely report on this information. Yet this Court does not have a single piece of evidence from any of these sources to support the proffered market definition.

Lastly, the Court agrees that Mr. Tatos' declaration does not answer a critical question that is necessary to define a labor market: "which employers 'workers [see] as reasonably good substitutes.'" Dkt. 737, ECF No. 11 at 26 (quoting *Robinson*, 172

F.4th at 293). As the NCAA puts it, "where [do] athletes actually go—or would [they] go—when Division I terms worsen[?]" Draft statistics may suffice under some circumstances, but the record here does not answer the question of where athletes turn to when terms worsen.

The Court acknowledges the preliminary stage of this proceeding and that at least some (or most) of the data lies within the NCAA's control. But Mr. Tatos' declaration fails to explain (1) whether he sought to obtain the data from the NCAA, CSC, or other relevant stakeholders, or (2) why he could not have sought data from Providence College or Big East Conference athletic channels or utilized other publicly accessible data. Without defining the relevant market, the Court must conclude that, on the current record before it, there is no likelihood of success on the antitrust claim.[6]

**C. Breach of Contract – Third-Party Beneficiary**

The Plaintiffs also bring breach of contract claims premised on the theory that they are intended third-party beneficiaries of the contractual relationship between the NCAA and its respective member institutions. Dkt. 737, ECF No. 10 at 17. Plaintiffs allege that the "NCAA Constitution and Bylaws constitute a binding contract between the NCAA and its member institutions across the United States." *Id.* Plaintiffs continue, "[t]he NCAA breached its obligations to Plaintiff[s] by adopting the Five-Year Eligibility Rule and excluding Plaintiff[s] from the opportunity for an additional season which other athletes are receiving." *Id.* For the

[6] The Court echoes the sentiment of the Fourth Circuit in *Robinson*. "[The Court is] merely holding that the [Plaintiffs] presented no factual evidence here and therefore clearly failed to meet their burden of proof." 172 F.4th at 294–95.

following reasons, the Court concludes that they are ultimately unlikely to succeed on this claim.[7]

First, given Plaintiffs' status as former players who exhausted their eligibility before the Five-Year Eligibility Rule went into effect, this Court is not convinced that Plaintiffs were still subject to the NCAA Constitution and Bylaws such that they can be fairly considered intended third-party beneficiaries thereto. Under Rhode Island law, to prevail in a breach of contract claim, "a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff." *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2010). To bring a third-party beneficiary claim, Plaintiffs must show that the underlying agreement was entered into "'for the benefit of a third party, the latter who would enjoy the benefits[.]'" *Hexagon Holdings, Inc. v. Carlisle Syntec Inc.*, 199 A.3d 1034, 1039 (R.I. 2019) (quoting *Glassie v. Doucette*, 157 A.3d 1092, 1097 (R.I. 2017)). Courts have found student-athletes are intended third-party beneficiaries of the contractual relationship between the NCAA and its member instructions as formed by the NCAA Constitution and Bylaws. *See, e.g., Battle v. NCAA*, No. 1:23-CV-101, 2024 WL 4685604, at *4–5 (N.D. W.Va. May 28, 2024); *Richardson v. Southeastern Conf.*, 612 F. Supp. 3d 753, 772 (N.D. Ill. 2020). Indeed, in addressing a breach of contract claim like the one at bar and reviewing language in the NCAA 2026-27 NCAA Division I Manual, the Rhode Island Superior

---

[7] Because the parties do not contest that Rhode Island law applies to this claim, the Court will apply Rhode Island law.

Court found "[b]y adopting and enforcing eligibility legislation and committing to student-athlete well-being, the NCAA displayed an intent to confer a benefit on the student-athletes." *Yriondo v. Nat'l Collegiate Athletic Ass'n*, No. PC-2026-04935, slip op. at 11 (R.I. Super. Ct. Sept. 30, 2026). Here, however, when Amended Bylaw 12.6 became effective on August 1, 2026, Plaintiffs were no longer student-athletes with remaining eligibility. They therefore lack standing to enforce the contractual right to which they argue they are entitled.

Even if, as Plaintiffs seem to allege, they are properly considered student-athletes for the sake of their third-party beneficiary claims, their position is still unavailing on this TRO posture because they have not established a likelihood of success on proving the NCAA has breached the contract as to them. Dkt. 737, ECF No. 10 at 17. Put succinctly, Plaintiffs argue that because Amended Bylaw 12.6 does not contemplate an enrollment-year limitation or explicit exclusion of the high school class of 2022, based on the plain language of the Rule they remain in the window of eligibility such that they may avail themselves of the five-year period of eligibility. Dkt. 737, ECF No. 12 at 7–8. The NCAA pushes back, pointing to Rhode Island law's "well-settled principle" that statutes are implemented prospectively, not retroactively, and Bylaw 12.6's express statement that it became effective on August 1, 2026. Dkt. 737, ECF No. 11 at 34. Notably, Bylaw 12.01.1 explains that "[o]nly a student-athlete who meets the governing athletics eligibility legislation and interpretations is eligible for intercollegiate athletics participation in a particular sport." ECF No. 11-6 at 44. As the NCAA notes, that legislation "is published in the

NCAA's online Legislative Services Database. ECF No. 11 at 14. Finally, the NCAA also refers to its public statement that was issued the day the Rule was adopted, June 24, 2026, in which the NCAA explains retroactive application of the Rule would be disruptive because the 2026–27 cycle was already underway. *Id.* at 15.

As the Rhode Island Superior Court confirmed when addressing a similar claim, "ordinarily, the courts will not interfere with the internal workings of a voluntary organization as long as such rules are reasonable and consistent with public policy." *Yriondo*, No. PC-2026-04935, slip op. at 12 (quoting *King v. Grand Chapter of R.I. Order of E. Star*, 919 A.2d 991, 996 (R.I. 2007)). Here, the NCAA Manual bestows the Cabinet with ultimate deference over matters not subject to other committee oversight. *See* 2026-27 NCAA Division I Manual Bylaw 9.3.1.1. Thus, so long as the Cabinet's interpretations of Bylaw 12.6 are reasonable and consistent with public policy, the application of those interpretations cannot be considered a breach of the contract. With respect to this point, the NCAA asserts that "[t]he decision to apply the new age-based eligibility rule prospectively was not arbitrary, capricious, or an abuse of discretion. It was a reasonable line-drawing judgment adopted through the NCAA's ordinary governance process in response to unprecedented instability in college athletics." Dkt. 737, ECF No. 11 at 37. Considering the deference this Court is to afford the Cabinet, the Court finds this position compelling. This is especially so considering the NCAA's further explanation that:

> The Division I Cabinet, in consultation with the NCAA membership, chose a course of action that would avoid displacing athletes who had

> already secured roster spots; protect schools and coaches that had already made recruiting and transfer decisions for the 2026–27 year; preserve settled revenue-sharing allocations; and replace an unwieldy system of individualized waiver requests with a clear rule going forward.

*Id.* As the Rhode Island Superior Court concluded, "[p]rotecting student-athletes who would have been eligible under both the Four-Seasons-in-Five-Years and Five-Year Period of Eligibility is an appropriate and reasonable decision by the NCAA." *Yriondo*, No. PC-2026-04935, slip op. at 14. The Court agrees. Thus, given the record currently before this Court, the Plaintiffs are unlikely to succeed in demonstrating that the NCAA has breached the contract with respect to Simpson or Pinion or acted in any unreasonable manner when declining to retroactively allow the Rule to benefit them.

* * *

Because the Plaintiffs cannot demonstrate a likelihood of success on the merits of their claims, the Court declines to engage in the remaining temporary restraining order factors. *See Wine & Spirits Retailers, Inc.*, 418 F.3d at 46.

## IV. CONCLUSION

Based on the abbreviated record before the Court and the posture of the case, Plaintiffs have not carried their burden and therefore the Motions for Temporary Restraining Order are DENIED.

IT IS SO ORDERED.

Melissa R. DuBose
United States District Judge

10/22/2026